**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

Case No:

Honorable:

MAG ENTERPRISES, INC.; MAG PITT, LP; MAG ENTERTAINMENT, LLC; OASIS ON ESSINGTON, LLC; KWLT, LLC; KWON, LLC; BT CALIFORNIA, LLC; GOLD CLUB-SF, LLC; S.A.W. ENTERTAINMENT, LTD.; and KIMMICO, INC.,

    Plaintiffs,

v.

UNITED STATES SMALL BUSINESS ADMINISTRATION; ISABEL CASILLAS GUZMAN, in her Official Capacity as the Administrator of the United States Small Business Administration; and THE UNITED STATES OF AMERICA,

Defendants.

**PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

COME NOW all Plaintiffs listed in the above caption, and for their Complaint, hereby state the following:

**INTRODUCTION**

1.     This is a civil action wherein Plaintiffs seek an immediate, emergency, Temporary Restraining Order, and further injunctive relief, to restrain Defendants from violating their constitutional rights by discriminating against businesses and workers who are entitled to benefits from the Support for restaurants provisions (the "Restaurant Revitalization Fund" or "RRF"), Section 5003 of Title V, of the recently-enacted American Rescue Plan Act of 2021, Pub. L. 117-2 (2021) ("ARPA"), now, codified at 15 U.S.C. § 9009c. The RRF is a completely new program created by Congress in response to the COVID-19 Pandemic (the "Pandemic," or "COVID") following the President declaring a national emergency in March of 2020. Congress created the RRF to provide grants to restaurants, bars, taverns, and related

1

businesses, provided all of the relevant definitions for the program in ARPA, and tasked the Administrator of the SBA with awarding grants to eligible entities. In late April, the SBA began publishing "Program Guide[s]" to implement the RRF wherein the SBA substantively altered the definition of "affiliated business" Congress provided in ARPA and incorporated, without delegated authority, various provisions pertaining to eligibility for SBA business *loan* programs. The SBA's actions defy Congress's words in the statute, exceed the SBA's authority, contradict the SBA's enabling act, discriminate against First Amendment-protected businesses, and are otherwise invalid under the Administrative Procedures Act, 5 U.S.C. § 500 *et seq*. The SBA's Program Guides and incorporation of its business loan rules violate businesses' and workers' fundamental rights under the First and Fifth Amendments of the United States Constitution and generally exceed the SBA's authority.

2.      Specifically, this action challenges three things:

a.      The validity of the SBA's definition of "affiliated business" as found in the Restaurant Revitalization Funding Program, Program Guide as of April 28th, 2021," (the "Program Guide") and on the SBA's online RRF application portal;

b.      The validity of the SBA's incorporation of 13 C.F.R. § 120.110 as eligibility criteria for the RRF as found in the Program Guide; and

c.      The validity of the SBA's training slides and call center answers (the "Training Slide") that purportedly require an RRF applicant to withdraw either or both, as applicable, the applicant's pending Paycheck Protection Program ("PPP") application under the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 (2020) (the "CARES Act") or the Second Draw PPP under the Consolidated Appropriations Act, 2021, Pub. L. 116-260 (2020).

## JURISDICTION AND VENUE

3.      Jurisdiction is conferred on this Court for the resolution of the substantial constitutional questions presented here by virtue of 28 U.S.C. § 1331; 28 U.S.C. § 1343(a)(1), (3), (4); 28 U.S.C. § 1346(a)(2); and 28 U.S.C. § 1361.

4.      Authority for judicial review of agency action is further provided by 5 U.S.C. § 702, which states:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5.      The prayer for declaratory relief is founded in part on Rule 57 of the Federal Rules of Civil Procedure as well as in 28 U.S.C. § 2201, the latter of which provides that:

> . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. . . .

6.      Jurisdiction of this Court to grant injunctive relief is conferred upon this Court by Rule 65 of the Federal Rules of Civil Procedure, and by 28 U.S.C. § 2202, the latter of which provides: "Further necessary or proper relief on a declaratory judgment or decree may be granted after reasonable notice and hearing, against any adverse party whose right shave been determined by such judgment."

7.      No other action, civil or criminal, is pending in any state court involving the Plaintiffs regarding the activities and events here.

8.      This suit is authorized by law to redress deprivations of rights, privileges, and immunities secured by the First and Fifth Amendments to the United States Constitution, and for declaratory and injunctive relief.

9.      Pursuant to 28 U.S.C. § 1391(e), venue in this Court is appropriate as Plaintiffs MAG Enterprises, Inc., Oasis on Essington, LLC, and KWLT, LLC are located in the Eastern District of Pennsylvania; the Small Business Administration operates in the Eastern District of Pennsylvania; and the injury complained of and acts causing that injury have occurred and will continue to occur in the Eastern District of Pennsylvania.

10.     Venue is appropriate as to all plaintiffs because Plaintiffs MAG Enterprises, Inc., Oasis on Essington, LLC, and KWLT, LLC reside in the Eastern District of Pennsylvania. Further, because of financial hardships caused by the Pandemic, many of the Plaintiffs would not be financially able to assert these claims if required to litigate individually in multiple jurisdictions.

## PARTIES

*Plaintiffs*

11.     Plaintiff MAG Enterprises, Inc. is a Pennsylvania Corporation duly organized and authorized to do business in the Commonwealth of Pennsylvania. MAG Enterprises, Inc., does business as Cheerleaders Gentlemen's Club at 2740 South Fort Street in Philadelphia, Pennsylvania.

12.     Plaintiff MAG Pitt LP is a Pennsylvania Limited Partnership duly organized and authorized to do business in the Commonwealth of Pennsylvania. MAG Pitt LP does business as Cheerleaders Gentlemen's Club at 3100 Liberty Ave in Pittsburgh, Pennsylvania.

13.     Plaintiff MAG Entertainment, LLC is a New Jersey Limited Liability Company duly organized and authorized to do business in the State of New Jersey. MAG Entertainment, LLC does business as Cheerleaders Gentlemen's Club at 54 Crescent Blvd., in Gloucester City, New Jersey.

14.     Plaintiff Oasis On Essington, Limited, LLC is a Pennsylvania Limited Liability Company duly organized and authorized to do business in the Commonwealth of Pennsylvania. Oasis On Essington, Limited, LLC does business as Cheerleaders Gentlemen's Club at 6800 Essington Ave. in Philadelphia, Pennsylvania.

15.     Plaintiff KWLT, LLC is a South Carolina Limited Liability Company authorized to do business in the Commonwealth of Pennsylvania. KWLT, LLC does business as Platinum Plus at 1251 Airport Road in Allentown, Pennsylvania.

16.     Plaintiff KWON, LLC, is a South Carolina Limited Liability Company duly organized and authorized to do business in the State of South Carolina. KWON, LLC, does business as Platinum West at 1995 Old Dunbar Road in West Columbia, South Carolina.

17.     Plaintiff BT California, LLC is a Nevada Limited Liability Company duly organized under the laws of Nevada and authorized to conduct business in the State of California. BT California, LLC does business as Vanity Club at 412 Broadway in San Francisco, California.

18.     Plaintiff Gold Club-SF, LLC, is a Nevada Limited Liability Company duly organized under the laws of Nevada and authorized to conduct business in the State of California. Gold Club-SF, LLC does business as the Gold Club at 650 Howards Street in San Francisco, California.

19.     S.A.W. Entertainment, LTD., is a California Corporation duly organized and authorized to do business in the State of California. S.A.W. Entertainment, Ltd.,

does business as Larry Flynt's Hustler Club at 1031 Kearny Street and Condor Club at 560 Broadway Street in San Francisco, California.

20.    Plaintiff Kimmico, Inc. is a Maryland Corporation duly organized and authorized to do business in the State of Maryland. Kimmico, Inc. does business as Fantasies Nightclub & Sports Bar at 5520 Pennington Ave. in Baltimore, Maryland.

*Defendants*

21.    Defendant United States Small Business Administration (the "SBA") is an independent federal agency created and authorized pursuant to 15 U.S.C. § 633, *et seq*. The SBA maintains a branch office at 660 American Ave., Suite 301 in King of Prussia, Montgomery County, Pennsylvania, which is within the Eastern District of Pennsylvania.

22.    Defendant Isabel Casillas Guzman ("Guzman," or the "Administrator") is the Administrator of the SBA, a Cabinet-level position, and is sued in her official capacity only, as the Administrator of the SBA.

23.    Authority to sue the Administrator is granted by 15 U.S.C. § 634(b), which states, in part:

> In the performance of, and with respect to, the functions, powers, and duties vested in him by this chapter the Administrator may—(1) sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy . . . .

24.    Defendant United States of America is a sovereign nation dedicated to the protection of life, liberty, and property as set forth in the Bill of Rights and other provisions and amendments to the Constitution of the United States.

25.    Plaintiffs do not seek damages and pray only for declaratory and injunctive relief under 5 U.S.C. § 701, *et seq*. in order to restrain the actions of the SB and the Administrator in each of their official capacities.

## RELEVANT STATUTORY PROVISIONS AND ADMINISTRATIVE GUIDANCE

26.     Congress created the SBA on July 30, 1953. Small Business Act of 1953, Pub. L. 83-163, tit. II, 67 Stat. 232, *et seq.*, (1953), with the purpose "to 'aid, counsel, assist and protect, insofar as is possible, the interests of small business concerns.'" https://www.sba.gov/document/policy-guidance--small-business-act (last visited May 11, 2021).

27.     In 1953, the SBA promulgated a rule known as the "Opinion Molder Rule," which, with few exceptions, provided that "no business loan may be made to an applicant engaged in the 'creation, origination, expression, dissemination, propagation or distribution of ideas, values, thoughts, opinions or similar intellectual property regardless of medium, form or content.'" Business Loan Policy—Media Policy Rule, 59 Fed. Reg. 15872 (Proposed, Apr. 5, 1994), 1994 WL 109887 (quoting 13 C.F.R. § 120.101-2(b) (1993)). The reasoning behind for this rule was threefold:

> First, the prohibition is based upon SBA's desire to avoid any possible accusation that the Government is attempting to control editorial freedom by subsidizing media or communication for political or propaganda purposes. Second, the Agency has generally sought to avoid Government identification through its business assistance programs with concerns which might publish or produce matters of a religious or controversial nature. Third, SBA recognizes that the constitutionally protected rights of freedom of speech and press ought not to be compromised either by the fear of Government reprisal or by the expectation of Government financial assistance.

59 Fed. Reg. 15872, 1994 WL 109887.

28.     On April 5, 1994, the SBA promulgated a Proposed Rule to repeal the Opinion Molder Rule "primarily in order to make assistance available to a larger universe of small businesses" because the SBA "considered whether the policy determinations which where [sic] the underpinnings of the former rule should be maintained" and, "[a]fter careful review, [the] SBA is persuaded that repeal is appropriate." Policy Rule, 59 Fed. Reg. 15873 (Proposed, Apr. 5, 1994), 1994 WL

109887. About three months later, the SBA promulgated a final rule repealing its Opinion Molder Rule.

29. On July 15, 1994, the SBA repealed its "Opinion Molder Rule." The Opinion Molder Rule, in broad terms, had precluded communication-related businesses from receiving SBA aid. *See* Media Policy Rule, 59 Fed. Reg. 36042 (Final, Jul. 15, 1994), 1994 WL 364161.

30. A true and accurate copy of Business Loan Policy—Media Policy Rule, 59 Fed. Reg. 15872-73 (Proposed, Apr. 5, 1994) is attached hereto as **Exhibit A** and is hereby incorporated by reference as though fully set forth herein.

31. A true and accurate copy of Media Policy Rule, 59 Fed. Reg. 36042-45 (Final, Jul. 15, 1994), 1994 WL 364161 which repealed the Opinion Molder Rule, is attached hereto as **Exhibit B** and is hereby incorporated by reference as though fully set forth herein.

32. In response to the SBA's repeal of the Opinion Molder Rule, Congress undertook to revise the Small Business Administration's enabling Act by, among other things, adding Subsection (e) to Section 633 of Title 15 of the United States Code (hereafter, the "Statutory Obscenity Loan Ban"), which the President of the United States of America signed into law on October 22, 1994, via the Small Business Reauthorization and Amendments Act of 1994, Pub. L. 103-403 (1994). The Statutory Obscenity Loan Ban, in its entirety, reads:

> (e) Prohibition on provision of assistance
>
> Notwithstanding any other provision of law, the Administration is prohibited from providing any financial or other assistance to any business concern or other person engaged in the production or distribution of any product or service that has been determined to be obscene by a court of competent jurisdiction.

15 U.S.C. § 633(e).

33.    The legislative history of the Small Business Reauthorization and Amendments Act of 1994, Pub. L. 103,403 (1994), as it pertains to the Statutory Obscenity Loan Ban, states, in relevant part:

> During Committee markup of the bill, Senator Pressler offered an amendment, that was unanimously accepted by the Committee, to prohibit the Administration from providing assistance to businesses engaged in the production and distribution of obscene products or services. The amendment was offered in response to the Administration's recent repeal of its "opinion molder rule" promulgated in 1953. Under that rule, the Administration, with few exceptions, could not provide assistance to small businesses engaged in the "creation, origination, expression, dissemination, propagation or distribution of ideas, values, thought, opinions or similar intellectual property, regardless of medium, form, or content" (13 CFR 120.101–2(b)). With the repeal of the rule, businesses such as newspapers, movie theaters, radio stations and bookstores now are eligible for Administration assistance. However, members of the Committee were concerned a blanket repeal of the rule would allow businesses involved in the production and distribution of obscene products and services to seek Administration support and that the agency would have no means by which to deny such loans or other assistance. Senator Pressler's amendment makes it clear the Administration is not authorized to provide any assistance to those engaged in "obscene" businesses (and thus not entitled to First Amendment protection) as defined by the U.S. Supreme Court.

S. Rep. No. 103-332 § 612, at 3430-31 (1994); and

> Sec. 611. Prohibition on the provision of assistance
>
> The Senate bill prohibits the Administration from providing assistance to businesses engaged in the production and distribution of obscene products and services. This section was written in response to the recent repeal of SBA's "opinion molder rule". With the repeal of the rule, businesses such as newspapers, movie theaters, radio stations and bookstores now are eligible for SBA assistance. This means businesses involved in the production and distribution of obscene products and services also could seek Administration support. This section makes clear that the Administration is not authorized to provide any assistance to those engaged in any class of "obscene" business as defined by the U.S. Supreme Court (and thus not entitled to First Amendment protection).
>
> *    *    *
>
> The House bill had no similar provision.
>
> The conferees adopted the Senate provision with a clarification that any materials in question must have been judicially determined, in either a civil or criminal action, to be legally obscene under prevailing constitutional standards in order for the ban to apply.

9

H.R. Rep. No. 103-824 § 611, at 3455 (1994).

34.    Attached hereto as **Exhibit C** is a true and accurate copy of the relevant portions of S. Rep. No. 103-332, § 612, at 3430-31 (1994), which is incorporated herein by reference as though fully set forth herein.

35.    Attached hereto as **Exhibit D** is a true and accurate copy of the relevant portions of H.R. Rep. No. 103-824, § 611, at 3455 (1994), which is incorporated herein by reference as though fully set forth herein.

36.    On December 15, 1995, the SBA promulgated a Proposed Rule entitled "Business Loan Programs," 60 Fed. Reg. 64356, 60, 75 (Proposed Dec. 15, 1995; to be codified at 13 C.F.R. § 120.110) to revise its current regulatory scheme (a true and accurate copy being attached hereto as **Exhibit E** and is incorporated herein by reference as though fully set forth herein), which reads, in relevant part:

> SBA field office personnel and others also have sought guidance on the eligibility of small businesses which sell sexually oriented products or services, or engage in sexually oriented activities. The present regulation is silent regarding obscene, pornographic, or sexually oriented activities. A business engaging in any such activity that is illegal is ineligible under § 120.110(h) of this regulation. However, SBA receives inquiries regarding businesses engaged in activities which, while not illegal, may be considered by the average person to be obscene or pornographic.
>
> "Obscene" material is not protected by the First Amendment. It has been defined by the United States Supreme Court in the context of a criminal case, *Miller v. California*, 413 U.S. 15, 24 (1973), as follows: "* * * whether a work which depicts or describes sexual conduct is obscene is [determined by] whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest, whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."
>
> Under Supreme Court precedent, "[w]hen the government appropriates funds to establish a program, it is entitled to define the limits of that program." *Rust v. Sullivan*, 114 L.Ed.2d 233, 256 (1991). In implementing its programs, SBA must also follow the Congressional mandate set forth in Section 4(d) of the Small Business Act (15 U.S.C. 633(d)) ("the Act") to consider the public interest in granting or denying an application for SBA financial assistance.

Having considered the legal precedent and the Congressional mandate, SBA has determined that it may exclude small businesses engaging in lawful activities of an obscene, pornographic, or prurient sexual nature. Under the proposed rule, SBA would not provide financial assistance to small businesses which present live performances of a prurient sexual nature or which derive significant gross revenue from the sale, on a regular basis, of products or services, or the presentation of depictions or displays, of a pornographic, obscene, or prurient sexual nature. Thus, an establishment featuring nude dancing, or a book, magazine or video store containing merchandise of a prurient sexual nature would not be eligible for SBA financial assistance if the obscene, pornographic, or prurient activity contributed to the generation of a significant portion of the gross revenue of the business.

SBA considers this proposed rule to be consistent with its obligation to direct its limited resources and financial assistance to small businesses in ways which will best accomplish SBA's mission, serve its constituency, and serve the public interest. Applicants' First Amendment freedoms are in no way abridged. They may still express their views, exercise their freedoms, operate their businesses, and obtain any other aid available to them.

60 Fed. Reg. 64360.

37.    The SBA adopted its December 15, 1995, proposed rule entitled "Business Loan Programs" as a Final Rule, after a notice and comment period, on January 31, 1996, through its Final Rule, Business Loan Program, 61 Fed. Reg. 3226, *et seq.* (Jan. 31, 1996) (to be codified at 13 C.F.R. §§ 108, 116, 120, 122, 131); a copy being attached hereto as **Exhibit F** and incorporated herein by reference as though fully set forth herein.

38.    A true and accurate copy of the current SBA Business Loan Ineligible Businesses Rule, 13 C.F.R. § 120.110 (2021), is attached hereto as **Exhibit G** is herein by reference as though fully set forth herein, and reads, in relevant part:

13 C.F.R. § 120.110 provides, in part:

What businesses are ineligible for SBA business loans?

The following type of businesses are ineligible:

*        *        *

(p) Businesses which:

11

(1) Present live performances of a prurient sexual nature; or

2) Derive directly or indirectly more than *de minimis* gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature;

13 C.F.R. § 120.110 (2021). These provisions are hereafter referred to simply as the "Regulation."

39.    On March 11, 2021, the President signed the American Rescue Plan Act of 2021, Pub. L. 117-2 (2021) ("ARPA"), into law. Section 5003 ("Support for restaurants") therein created the Restaurant Revitalization Fund Grant Program (the "RRF"). Section 5003 of ARPA is now codified at 15 U.S.C. § 9009c.

40.    A true and accurate copy of Section 5003 of ARPA is attached hereto as **Exhibit H** and is incorporated herein by reference as though fully set forth herein.

41.    Generally, the RRF provides grants to restaurants, bars, taverns, and the like based on lost revenues incurred during the Pandemic.

42.    Congress statutorily defined the phrase "Affiliated Business" as:

The term "affiliated business" means a business in which an eligible entity has an equity or right to profit distributions of not less than 50 percent or in which an eligible entity has the contractual authority to control the direction of the business, provided that such affiliation shall be determined as of any arrangements or agreements in existence as of March 13, 2020.

15 U.S.C. § 9009c.(a)(2).

43.    Congress statutorily defined the phrase "eligible entity" as:

The term "eligible entity"—

(A) means a restaurant, food stand, food truck, food cart, caterer, saloon, inn, tavern, bar, lounge, brewpub, tasting room, taproom, licensed facility or premise of a beverage alcohol producer where the public may taste, sample, or purchase products, or other similar place of business in which the public or patrons assemble for the primary purpose of being served food or drink; . . .

(C) does not include—

(i) an entity described in subparagraph (A) that— . . .

12

(II) as of March 13, 2020, owns or operates (together with any affiliated businesses) more than 20 locations, regardless of whether those locations do business under the same or multiple names . . .

15 U.S.C. § 9009c.(a)(4).

44.    Congress dictated that for the RRF, "the pandemic-related revenue losses for an eligible entity shall be reduced by any amounts received from a covered loan made under paragraph (36) [the CARES Act PPP loans] or (37) [Consolidated Appropriations Act of 2020, Second Draw PPP loans] of section 636(a) of this title in 2020 or 2021."

45.    Congress provided that women-owned businesses, veteran-owned businesses, and businesses owned by socially and economically disadvantaged persons shall have priority to the RRF grants for the first 21 days.

46.    Thereafter, Congress stated:

Except as provided in subsection (b) and paragraph (3), the Administrator shall award grants to eligible entities in order in which applications are received by the Administrator.

47.    On April 20, 2020, the SBA promulgated a document titled "Restaurant Revitalization Funding Program, Program Guide as of April 20th, 2021," (the "April 20th Program Guide").

48.    A true and accurate copy of the April 20th Program Guide is attached hereto as **Exhibit I** and is incorporated herein by reference as though fully set forth herein.

49.    The April 20th Program Guide referenced 13 C.F.R. § 120.110 only in the context of franchises.

50.    The April 20th Program Guide defined "Affiliated businesses" exactly as Congress defined the term in ARPA.

51.    Eight days later, the SBA promulgated a document titled "Restaurant Revitalization Funding Program, Program Guide as of April 28th, 2021," (the "Program Guide").

13

52.    A true and accurate copy of the Program Guide is attached hereto as **Exhibit J** and is incorporated herein by reference as though fully set forth herein.

53.    Therein, the SBA added as "Other Ineligible Businesses," "Businesses are ineligible if any of the provisions of 13 CFR 120.110 applies."

54.    The Program Guide also added the following to Congress's definition of "Affiliated businesses":

> Sole proprietors (and self-employed individuals) must count as affiliates all businesses reported on IRS Form 1040, Schedule C.
>
> A holding company (which is a company that owns real estate for the benefit of an operating business) whose sole purpose is to hold the real estate for the eligible Applicant business should not be counted as a location or affiliate.
>
> When you are filing out your RRF application, you will be asked if the Applicant has affiliates.
>
> • You must select "yes," if the RRF eligible applicant entity has an equity interest or right to profit distributions of 50% or greater of one (or more) other business entity; and/or
>
> • You must select "yes," if any owner of 20% or greater equity interest of the RRF eligible applicant entity has an equity interest or right to profit distributions of 50% or greater of one (or more) other business entity; and/or
>
> • You must select "yes," if the Applicant business is a holding company or management company that owns or manages a business other than the Applicant business, or if the Applicant business is held or managed by a company that owns or manages other businesses you must count these entities as separate affiliates and locations.

55.    These additions to the definition of "affiliated businesses" are not found anywhere within the text of the ARPA and change the definition from that drafted by Congress.

56.    In the SBA's webinar for the RRF, the SBA's webinar slide stated, in relevant part: "Upon applying for RRF, Applicant must withdraw any outstanding PPP [Paycheck Protection Program] application" (again, the "Training Slide").

14

57.    A true and accurate copy of the Training Slide is attached hereto as **Exhibit K** and is incorporated herein by reference as though fully set forth herein. Further, this Training Slide can be found at the 33 minute, 17 second mark of: Special Briefing on the Restaurant Revitalization Fund, Youtube (Apr. 29, 2021), https://www.youtube.com/watch?v=nKnG_yEavG4 (at 33:17) (last visited May 9, 2021).

58.    On or about May 6, 2021, the SBA's call center, identified on the SBA's website    here:    https://www.sba.gov/funding-programs/loans/covid-19-relief-options/restaurant-revitalization-fund (last visited May 9, 2021), at the number 844-279-8898, reiterated the Training Slide's requirement that RRF applicants must withdraw their pending PPP applications in order to receive RRF benefits.

59.    With regard to the Training Slide's requirement that applicants withdraw their pending PPP applications, the Program Guide states: "note: upon applying for Restaurant revitalization funding, Applicant should withdraw any outstanding PPP application[.]"

60.    On April 28, 2021, the SBA's website, SBA.gov, in the chart under the heading "Cross-program eligibility on SBA COVID-19 relief options," stated in the cell under the column titled "Paycheck Protection Program Applicant" and the row titled "RRF recipient," that "PPP loans received by the RRF applicant will affect the applicant's funding calculation."

61.    A true and accurate copy of a screenshot of the SBA's website mentioned in paragraph 60 is attached hereto as **Exhibit L**  and is incorporated herein by reference as though fully set forth herein.

15

## GENERAL ALLEGATIONS

### M.A.G. Enterprises, Inc. ("MAG Enterprises")

62. MAG Enterprises is an alcohol and food serving establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, and/or topless. All of the entertainment presented at MAG Enterprises is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

63. MAG Enterprises has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on MAG Enterprises premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at MAG Enterprises.

64. MAG Enterprises is categorized as "722410 Drinking Places (Alcoholic Beverages" under the 2017 North American Industry Classification System ("NAICS") entity.

65. NAICS 722410 establishments are "known as bars, taverns, nightclubs, or drinking places primarily engaged in preparing and serving alcoholic beverages for immediate consumption.  These establishments may also provide limited food services."                                See                      also, https://www.census.gov/naics/?input=722410&year=2017&details=722410        (last visited May 10, 2021).

66. MAG Enterprises presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals including, but not limited to:

a. Liquor License #R297 LID #37473 issued by Commonwealth of Pa- PLCB. Included with the Liquor License are the following Permits: Sunday

Sales, Amusement, Extended Hours Food Permit, and Wholesale Liquor Purchase Permit;

> b.    Amusement License #197500 issued by City of Philadelphia;

> c.    Special Assembly #352883 issued by City of Philadelphia;

> d.    Private Dumpster #278514 issued by City of Philadelphia;

> e.    Business Privilege #85238 issued by City of Philadelphia;

> f.    Occupancy and Use #129291 issued by City of Philadelphia;

> g.    Handbill Distribution #298408 issued by City of Philadelphia;

> h.    Food Preparing and Serving 30 plus seats #208916 issued by City of Philadelphia;

> i.    Food Establishment Personnel Food Safety Certificates issued by Philadelphia Department of Public Health;

> j.    Sales Tax License #80075029 issued by PA Department of Revenue; and

> k.    Extension of Premises to have outdoor seating.

67.    On May 3, 2021, John Meehan, MAG Enterprises' President/Secretary, applied for the RRF via the SBA's online portal. MAG Enterprises was able to submit the RRF application. The application's status indicates it is currently under review.

68.    MAG Enterprises is eligible for the RRF under both the statutory definition of "affiliated businesses," 15 U.S.C. § 9009c.(a)(2), and under the SBA's Guidance.

69.    MAG Enterprises is, as of the filing of this action, currently open for business at 50% capacity and is required to close at midnight. As was required by state or local, or both, Public Health Orders, MAG Enterprises closed for business on or about March 16, 2020. Pursuant to the evolving state or local, or both, Public Health Orders, MAG Enterprises reopened outdoor service only on August 28, 2020, and closed each day at midnight. On September 8, 2020, MAG Enterprises reopened

17

indoor service at 25% capacity, again, closing at midnight and without the ability to serve alcohol without a corresponding food purchase and no bar seating. On November 20, 2020, MAG Enterprises closed for indoor service and reopened for indoor service on January 16, 2021 with the same restrictions as the September 8, 2020 reopening. As a direct and proximate result of such state or local, or both, Pandemic-related closures and limitations, MAG Enterprises has suffered significant business and financial losses.

70.     In order to mitigate its business losses, to provide monetary relief to its employees, and to pay its bills, MAG Enterprises applied for and, after litigation, received a PPP loan. MAG Enterprises has applied for a Second Draw PPP under the Consolidated Appropriations Act of 2021, but has not yet received that loan and is currently litigating that issue.

71.     MAG Enterprises has not withdrawn its pending Second Draw PPP application as such requirement is not found in ARPA, the RRF, or the Guidance.

72.     MAG Enterprises is fully qualified and eligible—but for the Regulation, or Guidance, or both—to receive an RRF under the relevant statutes.

73.     MAG Enterprises reasonably believes, based on previous and ongoing litigation regarding the PPP loans, that the SBA will use 13 C.F.R. § 120.110(p), as purportedly incorporated into the RRF's eligibility criteria pursuant to the Guidance, to deny, delay, or otherwise disqualify MAG Enterprises' RRF application.

74.     MAG Enterprises reasonably believes, based on the SBA's training slide that purports to require RRF applicants to withdraw their PPP applications as a condition for receiving RRF funds, that the SBA will use the fact that MAG Enterprises did not withdraw its Second Draw PPP application as a condition to deny, delay, or otherwise disqualify MAG Enterprises' RRF application.

75.     In the event that MAG Enterprises is unable to obtain an RRF, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue

18

to operate given the state, or local, or both, Pandemic-related Public Health Orders and capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, or view, or both, protected First Amendment activities.

### *MAG Pitt, LP ("MAG Pitt")*

76.    MAG Pitt is an alcohol and food serving establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at MAG Pitt is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

77.    MAG Pitt has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on MAG Pitt premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at MAG Pitt.

78.    MAG Pitt is categorized as a NAICS code 722410 establishment.

79.    MAG Pitt presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals including, but not limited to:

     a.    Allegheny Health Department Permit #202102180031;

     b.    Liquor License #R9778 LID #59695 issued by Commonwealth of PA-PLCB. Included with the Liquor License are the following Permits: Sunday Sales, Amusement, Extended Hours Food Permit, and Wholesale Liquor Purchase Permit;

     c.  City of Pittsburgh Bureau of Building Inspection Occupancy Permit;

    d.  Certificate of Occupancy #08-07173 issued by City of Pittsburgh; and

    e.  Sales Tax License #84476586 issued by PA Department of Revenue.

80.    On May 3 2021, John Meehan, MAG Pitt's President/Secretary, applied for the RRF via the SBA's online portal. MAG Pitt was able to submit the RRF application. The application's status indicates it is currently under review.

81.    MAG Pitt is eligible for the RRF under both the statutory definition of "affiliated businesses," 15 U.S.C. § 9009c.(a)(2), and under the SBA's Guidance.

82.    MAG Pitt is, as of the filing of this action, currently open for business at 50% capacity. As was required by state or local, or both, Public Health Orders, MAG Pitt closed for business on or about March 16, 2020. Pursuant to the evolving state or local, or both, Public Health Orders, MAG Pitt reopened June 5, 2020, with no restrictions; closed June 29, 2020; reopened August 26, 2020, subject to a 25% capacity limit, 11 pm closing time, no service of alcohol without a corresponding food purchase, and no bar seating; closed December 12, 2020; reopened Dec 26, 2020, for outside service only, reopened for indoor service on January 4, 2021, subject to a 25% capacity limit, midnight closing time, no service of alcohol without a corresponding food purchase, and no bar seating. As a direct and proximate result of such state or local, or both, Pandemic-related closures and limitations, MAG Pitt has suffered significant business and financial losses.

83.    In order to mitigate its business losses, to provide monetary relief to its employees, and to pay its bills, MAG Pitt applied for and, after litigation, received a PPP loan. MAG Pitt has applied for a Second Draw PPP under the Consolidated Appropriations Act of 2021, but has not yet received that loan and is currently litigating that issue.

84.    MAG Pitt has not withdrawn its pending Second Draw PPP application as such requirement is not found in ARPA, the RRF, or the Guidance.

85.     MAG Pitt is fully qualified and eligible—but for the Regulation, or Guidance, or both—to receive an RRF under the relevant statutes.

86.     MAG Pitt reasonably believes, based on previous and ongoing litigation regarding the PPP loans, that the SBA will use 13 C.F.R. § 120.110(p), as purportedly incorporated into the RRF's eligibility criteria pursuant to the Guidance, to deny, delay, or otherwise disqualify MAG Pitt's RRF application.

87.     MAG Pitt reasonably believes, based on the SBA's training slide that purports to require RRF applicants to withdraw their PPP applications as a condition for receiving RRF funds, that the SBA will use the fact that MAG Pitt did not withdraw its Second Draw PPP application as a condition to deny, delay, or otherwise disqualify MAG Pitt's RRF application.

88.     In the event that MAG Pitt is unable to obtain an RRF, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the state, or local, or both, Pandemic-related Public Health Orders and capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, or view, or both, protected First Amendment activities.

### MAG Entertainment, LLC ("MAG Entertainment")

89.     MAG Entertainment is an alcohol and food serving establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed and topless. All of the entertainment presented at MAG Entertainment is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

90.     MAG Entertainment has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed

on MAG Entertainment premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at MAG Entertainment.

91.    MAG Entertainment is categorized as a NAICS code 722410 establishment.

92.    MAG Entertainment presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals including, but not limited to:

a.    Plenary Retail Consumption License #0414-33-023-012 issued by the State of New Jersey Department of Law & and Public Safety Division of Alcoholic Beverage Control;

b.    Food License issued by Gloucester City, New Jersey;

c.    Bureau of Fire Prevention Inspection Certificate #0414-40214-001-01 issued by City of Gloucester Bureau of Fire Prevention Gloucester City Fire Department; and

d.    Camden County Division of Environmental Health Sanitary Inspection - Rating Satisfactory issued by Camden County Division of Environmental Health.

93.    On May 3, 2021, John Meehan, MAG Entertainment's Managing Member, applied for the RRF via the SBA's online portal. MAG Entertainment was able to submit the RRF application. The application's status indicates it is currently under review.

94.    MAG Entertainment is eligible for the RRF under both the statutory definition of "affiliated businesses," 15 U.S.C. § 9009c.(a)(2), and under the SBA's Guidance.

95.     MAG Entertainment is, as of the filing of this action, currently open for business at 50% capacity effective May 7, 2021. As was required by state or local, or both, Public Health Orders, MAG Entertainment closed for business on or about

22

March 16, 2020. Pursuant to the evolving state or local, or both, Public Health Orders, MAG Entertainment reopened for outdoor service only on July 15, 2020. On September 4, 2020, MAG Entertainment reopened for indoor service at 25% capacity with a mandated close time of the indoor area of 10:00 pm. As a direct and proximate result of such state or local, or both, Pandemic-related closures and limitations, MAG Entertainment has suffered significant business and financial losses.

96. In order to mitigate its business losses, to provide monetary relief to its employees, and to pay its bills, MAG Entertainment applied for and, after litigation, received a PPP loan. MAG Entertainment has applied for a Second Draw PPP under the Consolidated Appropriations Act of 2021 but has not yet received that loan and is currently litigating that issue.

97. MAG Entertainment LLC has not withdrawn its pending Second Draw PPP application as such requirement is not found in ARPA, the RRF, or the Guidance.

98. MAG Entertainment LLC is fully qualified and eligible—but for the Regulation, or Guidance, or both—to receive an RRF under the relevant statutes.

99. MAG Entertainment reasonably believes, based on previous and ongoing litigation regarding the PPP loans, that the SBA will use 13 C.F.R. § 120.110(p), as purportedly incorporated into the RRF's eligibility criteria pursuant to the Guidance, to deny, delay, or otherwise disqualify MAG Entertainment's RRF application.

100. MAG Entertainment reasonably believes, based on the SBA's training slide that purports to require RRF applicants to withdraw their PPP applications as a condition for receiving RRF funds, that the SBA will use the fact that MAG Entertainment did not withdraw its Second Draw PPP application as a condition to deny, delay, or otherwise disqualify MAG Entertainment's RRF application.

101. In the event that MAG Entertainment LLC is unable to obtain an RRF, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to

continue to operate given the state, or local, or both, Pandemic-related Public Health Orders and capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, or view, or both, protected First Amendment activities.

### *Oasis on Essington, LLC ("Oasis")*

102. Oasis is an alcohol and food serving establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, and/or topless. All of the entertainment presented at Oasis is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

103. Oasis has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on Oasis premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at Oasis.

104. Oasis is categorized as a NAICS code 722410 establishment.

105. Oasis presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals including, but not limited to:

    a.    Liquor License #R4110 LID #50535 issued by Commonwealth of Pa- PLCB. Included with the Liquor License are the following Permits: Sunday Sales, Amusement, Extended Hours Food Permit, and Wholesale Liquor Purchase Permit;

    b.    Amusement License #197762 issued by City of Philadelphia;

c.    Business Privilege License # 191842 issued by City of Philadelphia;

d.    Commercial Activity License #152729 issued by City of Philadelphia;

e.    Occupancy and Use #1465830 issued by City of Philadelphia;

f.    Lawful Occupancy issued by City of Philadelphia;

g.    Food Preparing and Serving 30 plus seats #208956 issued by City of Philadelphia;

h.    Food Establishment Personnel Food Safety Certificates issued by Philadelphia Department of Public Health; and

i.    Sales Tax License #82592872 issued by PA Department of Revenue.

106.    On May 4, 2021, Anthony Alberto, one of Oasis' partners, applied for the RRF via the SBA's online portal. Oasis was able to submit the RRF application. The application's status indicates it is currently under review.

107.    Oasis is eligible for the RRF under both the statutory definition of "affiliated businesses," 15 U.S.C. § 9009c.(a)(2), and under the SBA's Guidance.

108.    Oasis is, as of the filing of this action, currently open for business at 50% capacity and a required closure time of midnight. As was required by state or local, or both, Public Health Orders, Oasis closed for business on or about March 16, 2020. Pursuant to the evolving state or local, or both, Public Health Orders, Oasis reopened on Sept 8, 2020, at 25% capacity while required to close at midnight and being permitted to serve alcohol only with a corresponding food purchase and no bar seating. Oasis closed again on Nov 20, 2020, reopened Jan 16, 2021, with same restrictions as opening on September 8th 2020. As a direct and proximate result of such state or local, or both, Pandemic-related closures and limitations, Oasis has suffered significant business and financial losses.

25

109.    In order to mitigate its business losses, to provide monetary relief to its employees, and to pay its bills, Oasis applied for and, after litigation, received a PPP loan. Oasis has applied for a Second Draw PPP under the Consolidated Appropriations Act of 2021, but has not yet received that loan and is currently litigating that issue.

110.    Oasis has not withdrawn its pending Second Draw PPP application as such requirement is not found in ARPA, the RRF, or the Guidance.

111.    Oasis is fully qualified and eligible—but for the Regulation, or Guidance, or both—to receive an RRF under the relevant statutes.

112.    Oasis reasonably believes, based on previous and ongoing litigation regarding the PPP loans, that the SBA will use 13 C.F.R. § 120.110(p), as purportedly incorporated into the RRF's eligibility criteria pursuant to the Guidance, to deny, delay, or otherwise disqualify Oasis' RRF application.

113.    Oasis reasonably believes, based on the SBA's training slide that purports to require RRF applicants to withdraw their PPP applications as a condition for receiving RRF funds, that the SBA will use the fact that Oasis did not withdraw its Second Draw PPP application as a condition to deny, delay, or otherwise disqualify Oasis' RRF application.

114.    In the event that Oasis is unable to obtain an RRF, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the state, or local, or both, Pandemic-related Public Health Orders and capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, or view, or both, protected First Amendment activities.

*KWLT, LLC ("KWLT")*

115.   KWLT is an alcohol and food serving establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at KWLT is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

116.   KWLT has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on KWLT's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their dance performances at KWLT.

117.   KWLT is categorized as a NAICS code 722410 establishment.

118.   KWLT presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals including, but not limited to:

   a.   A Food Service Establishment license issued by the City of Allentown, PA;

   b.   A Certificate of Occupancy issued by the City of Allentown;

   c.   A Cigarette Vending Machine License issued by the City of Allentown;

   d.   A Place of Assembly Permit issued by the City of Allentown;

   e.   A Business License issued by the City of Allentown;

   f.   A Sales Tax License issued by the Pennsylvania Department of Revenue;

   g.   A Certificate of Operation issued by the Pennsylvania Department of Labor & Industry;

h.      An Amusement Permit (Liquor), Extended Hours Food Permit, and a Sunday Sales Permit issued by the Pennsylvania Liquor Control Board; and

i.      A Wholesale Liquor Purchase Permit issued by the Pennsylvania Liquor Control Board.

119.    Gregory Kenwood Gaines is a 100% owner of KWLT. G. Kenwood Gaines is a veteran and served honorably in the United States Army from approximately July 7, 1980, to July 7, 1986 when he was honorably discharged. Because G. Kenwood Gaines meets the criteria as a veteran and owns 51% or greater share of KWLT, KTWL meets the requisite qualifications for the initial 21-day priority period pursuant to 15 U.S.C. § 9009c.(c)(3)(A).

120.    On or about May 4, 2021, at approximately 9:00 am eastern, Modern Bookkeeping, Inc., KWLT's bookkeeping service attempted to apply for the RRF for its various clients, KWLT included, via the SBA's online portal. Modern Bookkeeping, Inc., used one of its clients as a test application and was unable to finish or submit that application due to the program's requirement of inputting a number of affiliates of 20 or less based on the Application's prompts. Because KWLT would have had the same problem, Modern Bookkeeping, Inc., did not attempt to apply for the RRF for KWLT believing it would be an exercise in futility.

121.    Though KWLT believes the additional affiliation requirements imposed by the SBA are invalid and inappropriate, and because of the stiff penalties for submitting information that is false according to the application's prompts KWLT was unable to actually submit the RRF application.

122.    Pursuant to the statutory definition of "affiliated business," 15 U.S.C. § 9009c.(a)(2), KWLT does not have any affiliated businesses.

28

123.    Pursuant to the SBA's Guidance regarding "affiliated businesses," KWLT has 7 affiliated businesses and is managed by a business that manages or is a 50% owner of more than 20 other similar businesses.

124.    KWLT is, as of the filing of this action, currently open for business. As was required by state or local, or both, Public Health Orders, KWLT closed for business on or about March 16, 2020. Pursuant to the evolving state or local, or both, Public Health Orders, re-opened on July 3, 2020, reclosed on July 13, 2020, re-opened on October 23, 2020, re-closed on December 11, 2020, then re-opened on Jan 4, 2021 subject to a 75% capacity restriction for restaurants and bars. As a direct and proximate result of such state or local, or both, Pandemic-related closures and limitations, KWLT has suffered significant business and financial losses.

125.    In order to mitigate its business losses, to provide monetary relief to its employees, and to pay its bills, KWLT applied for and received a PPP loan.  KWLT has applied for a Second Draw PPP under the Consolidated Appropriations Act of 2021, but has not yet received that loan.

126.    KWLT has not withdrawn its pending Second Draw PPP application as such requirement is not found in ARPA, the RRF, or the Guidance.

127.    KWLT is fully qualified and eligible—but for the Regulation, or Guidance, or both—to receive an RRF under the relevant statutes.

128.    KWLT reasonably believes, based on previous litigation regarding the PPP loans, or its knowledge of previous litigation regarding the PPP loans, or both, that the SBA will use 13 C.F.R. § 120.110(p) as purportedly incorporated into the RRF's eligibility criteria pursuant to the Guidance to deny or otherwise disqualify KWLT's RRF application.

129.    KWLT reasonably believes, based on the Guidance and the SBA's RRF application portal's prompts, that the SBA will use the additional affiliation rules not

found in ARPA, but, rather, issued in the SBA's Guidance, to deny or otherwise disqualify KWLT's RRF application.

130. In the event that KWLT is unable to obtain an RRF, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the state, or local, or both, Pandemic-related Public Health Orders and capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, or view, or both, protected First Amendment activities.

### KWON, LLC ("KWON")

131. KWON is an alcohol and food serving establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed or topless. All of the entertainment presented at KWON is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

132. KWON has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on KWON's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their dance performances at KWON.

133. KWON is categorized as a NAICS code 722410 establishment.

134. KWON presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals including, but not limited to:

    a.    An Occupancy permit issued by the Lexington County Fire Service;

    b.    A Retail Liquor License issued by the State of South Carolina;

30

c.     A Place of Amusement Operating License issued by the State of Carolina Department of Revenue;

d.     An On Premise Beer and Wine Permit issued by the South Carolina Department of Revenue;

e.     A Business Liquor by the Drink License issued by the South Carolina Department of Revenue;

f.     A Local Option – 52 Weeks License issued by the South Carolina Department of Revenue; and

g.     A Retail Food Establishment Permit issued by the South Carolina Department of Health and Environmental Control.

135.   Gregory Kenwood Gaines is a 100% owner of KWON. G. Kenwood Gaines is a veteran and served honorably in the United States Army from approximately July 7, 1980, to July 7, 1986 when he was honorably discharged. Because G. Kenwood Gaines meets the criteria as a veteran and owns 51% or greater share of KWON, KWON meets the requisite qualifications for the initial 21-day priority period pursuant to 15 U.S.C. § 9009c.(c)(3)(A).

136.   On or about May 3, 2021, Modern Bookkeeping, Inc., KWON's bookkeeping service attempted to apply for the RRF for its various clients, KWON included, via the SBA's online portal. Modern Bookkeeping, Inc., used one of its clients as a test application and was unable to finish or submit that application due to the program's requirement of inputting a number of affiliates of 20 or less based on the Application's prompts. Because KWON would have had the same problem, Modern Bookkeeping, Inc., did not attempt to apply for the RRF for KWON believing it would be an exercise in futility.

137.   Though KWON believes the additional affiliation requirements imposed by the SBA are invalid and inappropriate, and because of the stiff penalties for

31

submitting information that is false according to the application's prompts KWON was unable to actually submit the RRF application.

138.    Pursuant to the statutory definition of "affiliated business," 15 U.S.C. § 9009c.(a)(2), KWON does not have any affiliated businesses.

139.    Pursuant to the SBA's Guidance regarding "affiliated businesses," KWON has 7 affiliated businesses and is managed by a business that manages or is a 50% owner of more than 20 other similar businesses.

140.    KWON is, as of the filing of this action, currently open for business. As was required by state or local, or both, Public Health Orders, KWON closed for business on or about March 17, 2020. Pursuant to the evolving state or local, or both, Public Health Orders, re-opened on May 22, 2020, subject to a 250 guess limit and a prohibition on the service of alcohol after 11 pm. KWON reclosed on May 23, 2020, re-opened on August 28, 2020, limited to 50% capacity and no alcohol service after 11 pm. The capacity and alcohol service restrictions were recently lifted on March 1, 2021. As a direct and proximate result of such state or local, or both, Pandemic-related closures and limitations, KWON has suffered significant business and financial losses.

141.    In order to mitigate its business losses, to provide monetary relief to its employees, and to pay its bills, KWON applied for and received both a PPP loan and a Second Draw PPP loan. Per the RRF, any RRF grant KWON receives will be reduced by these amounts.

142.    KWON has not withdrawn its pending Second Draw PPP application as such requirement is not found in ARPA, the RRF, or the Guidance.

143.    KWON is fully qualified and eligible—but for the Regulation, or Guidance, or both—to receive an RRF under the relevant statutes.

144.    KWON reasonably believes, based on previous litigation regarding the PPP loans, or its knowledge of previous litigation regarding the PPP loans, or both,

32

that the SBA will use 13 C.F.R. § 120.110(p) as purportedly incorporated into the RRF's eligibility criteria pursuant to the Guidance to deny or otherwise disqualify KWON's RRF application.

145.   KWON reasonably believes, based on the Guidance and the SBA's RRF application portal's prompts, that the SBA will use the additional affiliation rules not found in ARPA, but, rather, issued in the SBA's Guidance, to deny or otherwise disqualify KWON's RRF application.

146.   In the event that KWON is unable to obtain an RRF, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the state, or local, or both, Pandemic-related Public Health Orders and capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, or view, or both, protected First Amendment activities.

### BT California, LLC ("BT")

147.   BT is an alcohol and food serving establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at BT is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

148.   BT has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on BT's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at BT.

149.   BT is categorized as a NAICS code 72 establishment.

150. BT presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals including, but not limited to: a Class/Permit Number H26/32781 License Certificate issued by the City of San Francisco that describes BT as an "H26 Restaurant Over 2,000 SQ" issued to Alternative Entertainment, Inc., a wholly owned subsidiary of BT.

151. On or about May 4, 2021, Consolidated Bookkeeping and Management Services, Inc. ("Consolidated"), BT's bookkeeping and management service, attempted to apply for the RRF for its various clients, BT included, via the SBA's online portal. To streamline the application process, Consolidated used one of its clients as a test applicant and sent the application materials to its accounting firm. Its accounting firm informed Consolidated that, based on the Program Guide and the application portal's incorporation of the Program Guide's affiliated business definitions, that that client would be ineligible to even apply based on the number of affiliates it has, BT being one of them, under the Program Guide. Because BT would have had the same problem, Consolidated did not attempt to apply for the RRF for BT believing it would be an exercise in futility.

152. Though BT believes the additional affiliation requirements imposed by the SBA are invalid and inappropriate, and because of the stiff penalties for submitting information that is false according to the application's prompts BT was unable to actually submit the RRF application.

153. Pursuant to the statutory definition of "affiliated business," 15 U.S.C. § 9009c.(a)(2), BT does not have any affiliated businesses.

154. Pursuant to the SBA's Guidance regarding "affiliated businesses," BT has 21 affiliated businesses.

155. BT is, as of the filing of this action, currently open for business subject to 50% capacity restrictions. As was required by state or local, or both, Public Health Orders, BT closed for business on or about March 16, 2020. Pursuant to the evolving

state or local, or both, Public Health Orders, re-opened on October 8, 2020, at 25% capacity restrictions and the requirement that food be sold to ever patron ordering an alcoholic drink. State or local, or both, Public Health Orders then required BT to close again on November 14, 2020, and permitted BT to reopen again on March 5, 2021, at 25% capacity. Capacity restrictions were recently eased to 50% on May 4, 2021. As a direct and proximate result of such state or local, or both, Pandemic-related closures and limitations, BT has suffered significant business and financial losses.

156.  In order to mitigate its business losses, to provide monetary relief to its employees, and to pay its bills, BT applied for both a PPP loan and a Second Draw PPP loan. BT received the PPP loan but is still awaiting a decision on its Second Draw PPP loan application.

157.  BT is fully qualified and eligible—but for the Regulation, or Guidance, or both—to receive an RRF under the relevant statutes.

158.  BT reasonably believes, based on its knowledge of the SBA applying the Regulation to other similar establishments with regard to their PPP and Second Draw PPP loan applications and those same establishments having to resort to litigation in order to receive their PPP or Second Draw PPP, or both, loans, that the SBA will use 13 C.F.R. § 120.110(p) as purportedly incorporated into the RRF's eligibility criteria pursuant to the Guidance to deny or otherwise disqualify BT's RRF application.

159.  BT reasonably believes, based on the Guidance and the SBA's RRF application portal's prompts, that the SBA will use the additional affiliation rules not found in ARPA, but, rather, issued in the SBA's Guidance, to deny or otherwise disqualify BT's RRF application.

160.  In the event that BT is unable to obtain an RRF, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the state, or local, or both, Pandemic-related Public Health Orders and capacity

restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, or view, or both, protected First Amendment activities.

***Gold Club-SF, LLC ("Gold Club")***

161.    Gold Club is an alcohol and food serving establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Gold Club is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

162.    Gold Club has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on Gold Club's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at Gold Club.

163.    Gold Club is categorized as a NAICS code 72 establishment.

164.    Gold Club presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals including, but not limited to: a Class/Permit Number H26/32781 License Certificate issued by the City of San Francisco that describes Gold Club as an "H26 Restaurant Over 2,000 SQ" issued to Alternative Entertainment, Inc., a wholly owned subsidiary of Gold Club.

165.    On or about May 4, 2021, Consolidated Bookkeeping and Management Services, Inc. ("Consolidated"), Gold Club's bookkeeping and management service, attempted to apply for the RRF for its various clients, Gold Club included, via the SBA's online portal. To streamline the application process, Consolidated used one of its clients as a test applicant and sent the application materials to its accounting firm.

36

Its accounting firm informed Consolidated that, based on the Program Guide and the application portal's incorporation of the Program Guide's affiliated business definitions, that that client would be ineligible to even apply based on the number of affiliates it has, Gold Club being one of them, under the Program Guide. Because Gold Club would have had the same problem, Consolidated did not attempt to apply for the RRF for Gold Club believing it would be an exercise in futility. Though Gold Club believes the additional affiliation requirements imposed by the SBA are invalid and inappropriate, and because of the stiff penalties for submitting information that is false according to the application's prompts Gold Club was unable to actually submit the RRF application.

166. Pursuant to the statutory definition of "affiliated business," 15 U.S.C. § 9009c.(a)(2), GOLD CLUB does not have any affiliated businesses.

167. Pursuant to the SBA's Guidance regarding "affiliated businesses," Gold Club has 21 affiliated businesses.

168. Gold Club is, as of the filing of this action, currently open for business subject to 50% capacity restrictions. As was required by state or local, or both, Public Health Orders, Gold Club closed for business on or about March 16, 2020. Pursuant to the evolving state or local, or both, Public Health Orders, re-opened on October 8, 2020, at 25% capacity restrictions and the requirement that food be sold to ever patron ordering an alcoholic drink. State or local, or both, Public Health Orders then required Gold Club to close again on November 14, 2020, and permitted Gold Club to reopen again on March 5, 2021, at 25% capacity. Capacity restrictions were recently eased to 50% on May 4, 2021. As a direct and proximate result of such state or local, or both, Pandemic-related closures and limitations, Gold Club has suffered significant business and financial losses.

169.    In order to mitigate its business losses, to provide monetary relief to its employees, and to pay its bills, Gold Club applied for and received both a PPP loan and a Second Draw PPP loan.

170.    Gold Club is fully qualified and eligible—but for the Regulation, or Guidance, or both—to receive an RRF under the relevant statutes.

171.    Gold Club reasonably believes, based on its knowledge of the SBA applying the Regulation to other similar establishments with regard to their PPP and Second Draw PPP loan applications and those same establishments having to resort to litigation in order to receive their PPP or Second Draw PPP, or both, loans, that the SBA will use 13 C.F.R. § 120.110(p) as purportedly incorporated into the RRF's eligibility criteria pursuant to the Guidance to deny or otherwise disqualify Gold Club's RRF application.

172.    Gold Club reasonably believes, based on the Guidance and the SBA's RRF application portal's prompts, that the SBA will use the additional affiliation rules not found in ARPA, but, rather, issued in the SBA's Guidance, to deny or otherwise disqualify Gold Club's RRF application.

173.    In the event that Gold Club is unable to obtain an RRF, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the state, or local, or both, Pandemic-related Public Health Orders and capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, or view, or both, protected First Amendment activities.

### *SAW Entertainment Ltd. ("SAW")*

174.    SAW is an alcohol and food serving establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed,

topless, and/or fully nude. All of the entertainment presented at SAW is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

175. SAW has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on SAW's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at SAW.

176. SAW is categorized as a NAICS code 72 establishment.

177. SAW presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals including, but not limited to: a Class/Permit Number H26/11579 License Certificate issued by the City of San Francisco that describes SAW as an "H26 Restaurant Over 2,000 SQ."

178. On or about May 4, 2021, Consolidated Bookkeeping and Management Services, Inc. ("Consolidated"), SAW's bookkeeping and management service, attempted to apply for the RRF for its various clients, SAW included, via the SBA's online portal. To streamline the application process, Consolidated used one of its clients as a test applicant and sent the application materials to its accounting firm. Its accounting firm informed Consolidated that, based on the Program Guide and the application portal's incorporation of the Program Guide's affiliated business definitions, that that client would be ineligible to even apply based on the number of affiliates it has, SAW being one of them, under the Program Guide. Because SAW would have had the same problem, Consolidated did not attempt to apply for the RRF for SAW believing it would be an exercise in futility.

179. Though SAW believes the additional affiliation requirements imposed by the SBA are invalid and inappropriate, and because of the stiff penalties for submitting information that is false according to the application's prompts SAW was unable to actually submit the RRF application.

180. Pursuant to the statutory definition of "affiliated business," 15 U.S.C. § 9009c.(a)(2), SAW does not have any affiliated businesses.

181. Pursuant to the SBA's Guidance regarding "affiliated businesses," SAW has 21 affiliated businesses.

182. SAW is, as of the filing of this action, currently open for business subject to 50% capacity restrictions. As was required by state or local, or both, Public Health Orders, SAW closed for business on or about March 16, 2020. Pursuant to the evolving state or local, or both, Public Health Orders, re-opened on October 8, 2020, at 25% capacity restrictions and the requirement that food be sold to ever patron ordering an alcoholic drink. State or local, or both, Public Health Orders then required SAW to close again on November 14, 2020, and permitted SAW to reopen again on March 5, 2021, at 25% capacity. Capacity restrictions were recently eased to 50% on May 4, 2021. As a direct and proximate result of such state or local, or both, Pandemic-related closures and limitations, SAW has suffered significant business and financial losses.

183. In order to mitigate its business losses, to provide monetary relief to its employees, and to pay its bills, SAW applied for both a PPP loan and a Second Draw PPP loan. SAW received the PPP loan but is still awaiting a decision on its Second Draw PPP loan application.

184. SAW is fully qualified and eligible—but for the Regulation, or Guidance, or both—to receive an RRF under the relevant statutes.

185. SAW reasonably believes, based on its knowledge of the SBA applying the Regulation to other similar establishments with regard to their PPP and Second Draw PPP loan applications and those same establishments having to resort to litigation in order to receive their PPP or Second Draw PPP, or both, loans, that the SBA will use 13 C.F.R. § 120.110(p) as purportedly incorporated into the RRF's

eligibility criteria pursuant to the Guidance to deny or otherwise disqualify SAW's RRF application.

186.   SAW reasonably believes, based on the Guidance and the SBA's RRF application portal's prompts, that the SBA will use the additional affiliation rules not found in ARPA, but, rather, issued in the SBA's Guidance, to deny or otherwise disqualify SAW's RRF application.

187.   In the event that SAW is unable to obtain an RRF, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the state, or local, or both, Pandemic-related Public Health Orders and capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, or view, or both, protected First Amendment activities.

### *Kimmico, Inc. ("Kimmico")*

188.   Kimmico is an alcohol and food serving establishment open to the consenting adult public which has presented, presents, and desires to continue to present in the future, live female performance dance entertainment which is, at times, fully-clothed, topless, and/or fully nude. All of the entertainment presented at Kimmico is expression presumptively protected under the First Amendment to the United States Constitution and appeals to normal, healthy, sexual desires.

189.   Kimmico has never been charged with, let alone convicted of, any crimes of obscenity. Similarly, none of the entertainers who have performed on Kimmico's premises have ever been charged with, let alone convicted of, any crimes of obscenity related to their performances at Kimmico.

190.   Kimmico is categorized as a NAICS code 72 entity.

41

191.   Kimmico presents lawful, constitutionally protected entertainment in conformity with its various licenses, permits, and/or government approvals including, but not limited to:

    a.   A Liquor License issued by the State of Maryland;

    b.   An Adult Entertainment License issued by the City of Baltimore; and

    c.   A Health/Food Service permit issued by the City of Baltimore.

192.   Calvin Brockdorff is a 68% owner of Kimmico. Calvin Brockdorff is a veteran and served honorably in the United States Army from 1974 through 1976 when he was discharged under honorable conditions. Because Calvin Brockdorff meets the criteria as a veteran and owns 51% or greater share of Kimmico, Kimmico meets the requisite qualifications for the initial 21-day priority period pursuant to 15 U.S.C. § 9009c.(c)(3)(A).

193.   On or about May 10, 2021, Kimmico applied for the RRF via the SBA's online portal. Kimmico was able to submit the RRF application. The application's status indicates it is currently under review.

194.   Kimmico is eligible for the RRF under both the statutory definition of "affiliated businesses," 15 U.S.C. § 9009c.(a)(2), and under the SBA's Guidance.

195.   Kimmico is, as of the filing of this action, currently open for business at 50% capacity. As was required by local and/or state Public Health Orders, Kimmico closed for business on or about March 15, 2020. Pursuant to the evolving state and/or local Public Health Orders, Kimmico reopened and closed four times culminating totaling approximately eight months of complete closure, with its most recent reopening on or about March 15, 2021, after being closed since December 11, 2020. As a direct and proximate result of such municipal pandemic-related closures and limitations, Kimmico has suffered significant business and financial losses.

196.    In order to mitigate its business losses, to provide monetary relief to its employees, and to pay its bills, Kimmico applied for and received a PPP loan. Kimmico has applied for a Second Draw PPP under the Consolidated Appropriations Act of 2021, but has not yet received that loan and is currently litigating that issue.

197.    Kimmico has not withdrawn its pending Second Draw PPP application as such requirement is not found in ARPA, the RRF, or the Guidance.

198.    Kimmico is fully qualified and eligible—but for the Regulation, or Guidance, or both—to receive an RRF under the relevant statutes.

199.    Kimmico reasonably believes, based on previous litigation regarding the PPP loans and its current litigation to receive the Second Draw PPP that the SBA will use 13 C.F.R. § 120.110(p) as purportedly incorporated into the RRF's eligibility criteria pursuant to the Guidance to deny or otherwise disqualify Kimmico's RRF application.

200.    Kimmico reasonably believes, based on the SBA's Training Slide that purports to require RRF applicants to withdraw their PPP applications as a condition for receiving RRF funds, that the SBA will use the fact that Kimmico did not withdraw its Second Draw PPP application as a condition to deny, delay, or otherwise disqualify Kimmico's RRF application.

201.    In the event that Kimmico is unable to obtain an RRF, it may lack the staff, funds, and necessary PPE and facility upgrades to be able to continue to operate given the state, or local, or both, Pandemic-related Public Health Orders and capacity restrictions, which may well result in the permanent ruination of its business; its inability to engage in protected First Amendment activities; and the inability of its staff, entertainers, and customers to continue to engage in, associate for the purposes of engaging in, or view, or both, protected First Amendment activities.

*All Plaintiffs*

202.   MAG Enterprises, MAG Pitt, MAG Entertainment, Oasis, KWLT, KWON, BT, Gold Club, SAW, and Kimmico are collectively referred to herein as "Plaintiffs."

203.   As statutorily defined in 15 U.S.C. § 9009c.(a)(2), Plaintiffs do not have any affiliated businesses.

204.   As statutorily defined in 15 U.S.C. § 9009c.(a)(4), each Plaintiffs is an "eligible entity" for the RRF program.

205.   The SBA and its Administrator lack the authority to alter the statutory definitions in the RRF program or to implement the RRF program in a manner inconsistent with the statutory definitions.

206.   ARPA does not authorize the SBA or its Administrator to promulgate rules or regulations to implement the RRF.

207.   The Program Guide changes the affiliated business inquiry from the statutorily defined inquiry of what the eligible entity owns or controls to what owns, controls, or manages the eligible entity.

208.   The Program Guide is a series of substantive rules couched as general policy statements because it impose new duties by changing the nature of how affiliation is determined from the statutory language which focuses on what the applicant business owns or controls and incorporates the Regulation as eligibility criteria for the RRF.

209.   The Training Slide is a substantive rule couched as a general policy statement because it imposes the duty of withdrawing a pending PPP application as eligibility criteria for the RRF, whereas ARPA states that an eligible entity's RRF grant will be reduced by any amounts received under the PPP or Second Draw PPP programs. 15 U.S.C. § 9009c.(a)(7).

44

210.   Plaintiffs have no intention of unlawfully "double dipping" with the PPP, the Second Draw PPP, and the RRF. Because Congress statutorily mandated that RRF grants are to be reduced by the amounts an eligible entity received under both the PPP and the Second Draw PPP (as applicable), *see* 15 U.S.C. § 9009c.(a)(7), those Plaintiffs who have pending PPP applications (MAG Enterprises, MAG Pitt, MAG Entertainment, Oasis, and KWLT), but have not yet received PPP funds, would prefer to, if this Court enjoins the Defendants here, forego receiving PPP funds in lieu of receiving those funds through the RRF by not having their RRF grants reduced by the amount of those Plaintiffs applied for under the PPP.

211.   The SBA did not publish the April 20th Program Guide, the Program Guide, or the Training Slide in the Federal Register as required for rulemaking pursuant to 5 U.S.C. § 553.

212.   The Program Guide's definition of "affiliated business" contradicts 15 U.S.C. § 9009c.(a)(2).

213.   The SBA's RRF application portal requires a user to choose "yes" or "no" to the following prompt:

> Does the Applicant have affiliates?
>
> You must select "yes," if the RRF eligible applicant entity has an equity interest or right to profit distributions of 50% or greater of one (or more) other business entity; **and/or**
>
> You must select "yes," if any owner of 20% or greater equity interest of the RRF eligible applicant entity has an equity interest or right to profit distributions of 50% or greater of one (or more) other business entity; **and/or**
>
> You must select "yes," if the Applicant business is a holding company or management company that owns or manages a business other than the Applicant business, or if the Applicant business is held or managed by a company that owns or manages other businesses you must count these entities as separate affiliates and locations.

214.   A true and accurate copy of a screenshot of the application page discussed in the previous paragraph is attached hereto as **Exhibit M**  and is incorporated herein by reference as though fully set forth herein.

215.   If the applicant answers "yes" to the prompts in the previous paragraph, a new prompt appears on the screen asking "If yes, how many?" If the applicant inputs a number greater than 20, a callout appears that states "Please select a value that is no more than 20" and will not allow the applicant to proceed until an amount that is no more than 20 is inputted.

216.   A true and accurate copy of a screenshot of the phenomena described in the previous paragraph is attached hereto as **Exhibit N**  and is incorporated herein by reference as though fully set forth herein.

217.   RRF applicants are required to certify that:

the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a grant from SBA is punishable under the law, including $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

218.   The certification in the previous paragraph is found on SBA Form 3172, the "Restaurant Revitalization Funding Application," a true and accurate copy of which is attached hereto as **Exhibit O**  and is incorporated herein by reference as though fully set forth herein.

219.   As previously mentioned, as a result of the application prompts and the certification's penalties, Plaintiffs KWLT, KWON, BT, Gold Club, and SAW were unable to complete the RRF application.

220.   This is not the first time the SBA has been brought to court by entities that present live constitutionally protected female performance dance entertainment presented to the consenting adult public, for denying, delaying, or equivocating on

46

such entities' Pandemic-related benefits applications and/or the ability of such businesses to obtain or apply for Pandemic-related benefits.

221.    In three of these such lawsuits to secure PPP benefits, one taking place in the Eastern District of Michigan in an action captioned as DV Diamond Club of Flint, LLC v. United States Small Business Administration, another in the Eastern District of Wisconsin captioned as Camelot Banquet Rooms, Inc. v. United States Small Business Administration, and the other in the Southern District of Texas in an action captioned as D. Houston Inc. v. United States Small Bus. Admin., the plaintiffs in those actions (including, as referenced above, several of the Plaintiffs here) were successful in obtaining injunctions and/or rulings prohibiting the SBA from utilizing the Regulation as eligibility criteria for PPP loans. Specifically,

a.    The Eastern District of Michigan's injunction stated: "By 12:00 p.m. Eastern time on Thursday, May 14, 2020, the SBA shall notify the identified lender representatives in writing that (a) the applications by Plaintiffs and Intervenors for PPP loans shall not be denied based on the 'prurient sexual nature' provisions of the Original SBA Ineligibility Rule, the 2019 SOP, and/or the PPP Ineligibility Rule[.]" DV Diamond Club, 459 F. Supp. 3d 943, 965 (E.D. Mich. 2020). The court defined the phrase "Original SBA Ineligibility Rule" as being "codified at 13 C.F.R. § 120.110," id., at 947, and defined the phrase "PPP Ineligibility Rule" as the SBA's "rule excluding from PPP loan guarantee eligibility a wide range of businesses . . . and sexually oriented businesses that present entertainment or sell products of a 'prurient' (but not unlawful) nature[.]" Id. at 946. The SBA's motion in the Sixth Circuit to stay that injunction was denied. DV Diamond Club of Flint, LLC v. Small Bus. Admin. ("DV Diamond"), 960 F.3d 743 (6th Cir. 2020);

b.    This Eastern District of Wisconsin's order stated:

> The Administrator of the U.S. Small Business Administration and the Secretary of the Treasury, as well as their employees, agents and representatives, including the SBA's lending banks, are preliminarily enjoined from using 13 C.F.R. § 120.110(p) and the associated SBA Standard Operating Procedure (SOP 50 10 5(K) § III.A.15) in making eligibility determinations for loans under 15 U.S.C. § 636(a)(36). By **Monday, May 4, 2020, at 12:00 p.m.**, the Administrator of the U.S. Small Business Administration and the Secretary of the Treasury shall transmit guarantee authority to the plaintiffs' lenders so that those lenders may finish processing the plaintiffs' applications for PPP loans and immediately fund the loans.

Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin. (sometimes, "Camelot Banquet Case"), 458 F. Supp. 3d 1044, 1065 (E.D. Wis. 2020) (emphasis in original); and

> c.     In the Southern District of Texas, "exotic dance clubs" similar to those of the Plaintiffs here, sought "loans under the Paycheck Protection Program[.]" D. Houston Inc. v. United States Small Bus. Admin., No. CV H-20-2308, 2020 WL 6268528, at *1 (S.D. Tex. Oct. 20, 2020). The D. Houston court, similar to the DV Diamond court and the Camelot Banquet court, prohibited the SBA from enforcing the Regulation against those plaintiffs as eligibility criteria for PPP loans. Specifically, that court's ruling stated:

> The Court further ORDERS that Defendants notify approved lenders participating in the Paycheck Protection Program to whom Plaintiffs submitted loan applications on or before the August 8, 2020, deadline they are to reevaluate D. Houston, Inc., A.H.D. Houston, Inc., D. WG FM, Inc., D. Cam, LLC, W.L. York, Inc., and Westwood, Inc.'s applications for loans without regard to 13 C.F.R. § 120.110 (p). Notification to the lenders should be made within seven days of the signing of this Order to avoid any delay in processing these loan applications.

D. Houston Inc., 2020 WL 6268528, at *8.

222.   Despite the three court orders referenced in the paragraphs immediately above, the SBA continues to incorporate the Regulation into Pandemic-related relief programs including the RRF.

223.    Nowhere in the Regulation or any other documentation promulgated by the SBA, is there any definition as to what the phrase "prurient sexual nature," as used in the Regulation, means.

224.    In response to the three suits referenced above, the SBA and its Administrator have attempted, when challenged by the various courts, to articulate the meaning of the phrases "prurient sexual nature" or "live performances of a prurient sexual nature" as found in the Regulation.

225.    In <u>DV Diamond</u>, at an April 30, 2020, hearing, the SBA took the position that "prurient" meant "tending to arouse a 'lustful' or, you know 'lascivious' interest in sex." "The SBA's interpretation of 'prurient,' simply refers to, you know, invoking an avert [*sic*] strong sexual interest." Transcript of Motion for TRO and/or Preliminary Injunction, <u>DV Diamond</u>, 20-cv-10899 (E.D. Mich. Apr. 30, 2020), ECF 54, at 8:18-19; 58:5-6 (excerpt are attached hereto as **Exhibit P** and are hereby incorporated by reference as though fully set forth herein).

226.    Also in <u>DV Diamond</u>, at a later hearing, on May 5, 2020, the <u>DV Diamond</u> court noted the SBA had changed its position as it had argued before this Court that the term "prurient" meant "erotic." Transcript of Continued Hearing for Motion for TRO and/or Preliminary Injunction, <u>DV Diamond</u>, 20-cv-10899 (E.D. Mich. May 12, 2020), ECF 55, at 41:18-25 - 42:1-13 (excerpts are attached hereto as **Exhibit Q** and are hereby incorporated by reference as though fully set forth herein). In response to the court pointing out this inconsistency and also noting that such operationalization would render the Regulation unconstitutionally overbroad, the SBA retreated to its previous position that "prurient" means "lascivious or lustful." <u>Id.</u> at 42:14-25 – 43:1-7.

227.    In the <u>Camelot Banquet</u> case, the SBA took the position that:

> Businesses that feature live dancing explicitly intended to be "erotic" undoubtedly falls within the plain language of the regulation.

49

> *      *      *
>
> The SBA has restricted government-backed small-business loans to businesses engaged in live erotic performances for nearly twenty-five years.

Government Motion for Emergency Stay, Camelot Banquet, 2:20-cv-00601 (E.D. Wis. May 4, 2020), ECF 30, at pp. 4, 8 (excerpts are attached hereto as **Exhibit R** and are hereby incorporated by reference as though fully set forth herein).

228.    The SBA maintained, in its pleadings on appeal from the Camelot Banquet Case to the Seventh Circuit, its position that the term "prurient" as it appears in the Regulation meant "erotic."  For example, the SBA stated:

> The SBA's restriction on providing Section 7(a) loans to businesses that present live erotic performances dates back to 1996. *See* 61 Fed. Reg. 3226, 3240 (Jan. 31, 1996) (final rule); 60 Fed. Reg. 64356, 64360 (Dec. 15, 1995) (proposed rule).
>
> *      *      *
>
> Businesses that feature live dancing explicitly intended to be "erotic" undoubtedly fall within the plain language of the regulation.
>
> *      *      *
>
> The SBA has restricted government-backed small-business loans to businesses engaged in live erotic performances for nearly twenty-five years.

Government's Emergency Motion for Stay Pending Appeal, Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin., 20-1729 (7th Cir. May 4, 2020), ECF 4, at p. 4, 13, 17 (excerpts are attached as **Exhibit S** and are hereby incorporated by reference as though fully set forth herein).

229.    In its reply brief in the Seventh Circuit, the SBA took the following position with regard to the meaning of the term "prurient" as used in the Regulation:

> Plaintiffs' businesses— "Gentlemen's Clubs" which present live nude and semi-nude dance performances that are explicitly intended to be erotic—thus fall within the heart of the regulation's scope.
>
> *      *      *

50

> And although Congress explicitly lifted some of those restrictions in creating the Paycheck Protection Program, Congress did not lift or alter the SBA's longstanding restriction on loans to businesses that present live erotic performances.
>
> *    *    *
>
> The SBA could reasonably determine that, since Congress has expressly barred it from providing financial assistance to businesses that provide "obscene" products and services, the agency's limited resources are best directed to subsidizing businesses other than those that, although not "obscene" in the legal sense, are nonetheless "sexually oriented" and explicitly intended to be erotic.

Government's Reply In Support of Its Motion for Stay Pending Appeal, Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin., 20-1729 (7th Cir. May 11, 2020), ECF 14, at pp. 5, 7, 8 (excerpts are attached as **Exhibit T** and are hereby incorporated by reference as though fully set forth herein).

230. In D. Houston, at the September 11, 2020, Preliminary Injunction Hearing, the SBA specifically acknowledged, for the first time in these lawsuits, that the term "prurient" is in fact vague:

> THE COURT: Who's to determine what's a prurient interest? You know, there's the famous, what is it, Potter Stewart opinion, you know, the pornography opinion that came out, what, in the '50s? I think Stewart was on the Court at that time. He said he can't define it but he knows it when he sees it? Are we in an area like that?
>
> MR. KINCHELOE [Assistant United States Attorney; Attorney for the SBA]: It's vague, your Honor.

Transcript of Preliminary Injunction Hearing, D. Houston, 4:20-cv-02308 (S.D. Tex. Sept. 11, 2020), ECF 27, at pp. 29:23-25 – 30:1-4 (clarification added) (excerpts are attached as **Exhibit U** and are hereby incorporated by reference as though fully set forth herein).

231. The SBA is arbitrarily and without authority incorporating and applying the Regulation to prohibit adult entertainment establishments from receiving RRF grants.

232. By denying Plaintiffs access to the RRF, or denying their RRF applications, or both, the SBA is preventing Plaintiffs from receiving monies that can be used to, among other things: Pay wages and other benefits to their employees; a rent to landlord's; pay interest to mortgage holders; pay utility bills; pay employee sick leave, purchase PPE and cleaning materials; make rent payments; operational expenses; and various construction costs including the cost of installing outdoor seating—thus, placing Plaintiffs, their employees, the entertainers who perform on their premises, and their patrons at greater risk to COVID-19 than those entities which the SBA is not denying benefits under the RRF.

233. Upon information and belief, the SBA determines whether a business presents live performances of a prurient sexual nature without having ever visited the establishments or having viewed the live performances at the establishment. Plaintiffs do not present live performances of a prurient sexual nature on their premises. All of the performances on Plaintiffs' premises appeal to normal, healthy, sexual desires.

234. A national Temporary Restraining Order, Preliminary, and Permanent Injunction enjoining the Defendants from utilizing the Regulation or the Program Guide as eligibility criteria for the RRF or any future form of the RRF is necessary because it remains unknown how much longer this Pandemic will last and if Congress will re-fund the RRF, as it did with the PPP and the Second Round PPP. Given the RRF's, and any future form thereof's, purpose, Plaintiffs should not have to continue to litigate to have access to this Pandemic-related benefit program; especially considering restaurants, bars, and taverns have been some of the most hard-hit businesses in the nation by the Pandemic and in the absence of a national injunction, Plaintiffs may lack the funds to continue to litigate to receive the benefits available to them under these programs.

235. As set forth more fully below, the Regulation and the Program Guide are invalid and unenforceable for numerous and various reasons under administrative law and the First and Fifth Amendments to the United States Constitution. The Defendants' position that the Regulation and the Program Guide are valid and may be enforced against Plaintiffs or otherwise used to disqualify Plaintiffs from the RRF is not substantially justified; thereby entitling the Plaintiffs to an award of attorney fees pursuant to 28 U.S.C. § 2412.

<u>COUNT I</u>

**THE REGULATION AND THE PROGRAM GUIDE VIOLATE THE FIRST AMENDMENT**

236. In raising their First Amendment challenges to the Regulation and the Program Guide here, Plaintiffs assert not only their own rights but also the rights of their owners and employees, the entertainers who perform on their premises, and the customers who have in the past frequented, and intend in the future to frequent, Plaintiffs' premises in order to be able to observe First Amendment protected entertainment and otherwise engage in First Amendment-protected activities.

237. The Regulation and the Program Guide violate and are contrary to, the First Amendment to the United States Constitution, both on their face and as applied by the SBA to Plaintiffs, for numerous and various reasons including but not limited to the fact that:

     a. They are impermissible viewpoint-based restrictions on speech and expression that are not necessary to any compelling governmental interest and are not sufficiently narrowly tailored;

     b. They are impermissible content-based restrictions on speech and expression that are not necessary to any compelling governmental interest and are not sufficiently narrowly tailored;

c. They invidiously and impermissibly discriminate against disfavored speech and expression;

d. They violate, as applied to the First Amendment, the doctrine of unconstitutional conditions by conditioning the receipt of RRF grants and even application therefore upon the discontinuance of entertainment that the SBA opines, determines, or assumes without any analysis whatsoever, to be of a "prurient sexual nature" (whatever that may mean);

e. They effectuate, in order to obtain or even apply for RRF grants, an impermissible prior restraint on speech and expression;

f. Even if deemed to be content-neutral (which they cannot under any existing precedent), they do not further any permissible and important governmental interest;

g. They fail to conform to the constitutional standards regarding obscenity;

h. They impermissibly single out, and are being applied to single out, First Amendment-protected businesses for denial, and denial of the ability to even apply for, RRF benefits without justification;

i. They are unconstitutionally vague on their face and as applied, under the enhanced vagueness standards applied to laws that impact upon speech and expression; and

j. They are impermissibly and substantially overbroad in relation to their plain legitimate sweep.

238. As a direct and proximate result of the unconstitutional aspects of the Regulation and the Program Guide as well as the Defendants', and their delegates', application of them against Plaintiffs and Plaintiffs' interests, all as referenced above, Plaintiffs, as well as their owners and employees, the entertainers who perform on Plaintiffs' premises and the customers who frequent their establishments, have

suffered and will continue to suffer irreparable injuries, including but not limited to financial ruin; business ruination; violation of the First Amendment rights; and the inability to present, view, and/or engage in First Amendment-protected speech, expression, and entertainment.

239.    Because of the First Amendment rights being infringed upon by Defendants' application of the Regulation and the Program Guide as referenced above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

240.    Plaintiffs do not have adequate remedies at law because, among other reasons, the violation of their First Amendment Rights cannot be undone and they cannot recover damages against the Defendants as a result of governmental immunity. In addition, Plaintiffs have a substantial likelihood of success on the merits in regard to their claims asserted herein. Consequently, and because of the irreparable harm that is being suffered by these Plaintiffs, and which will continue to be suffered by these Plaintiffs if this Court does not grant preliminary relief, Plaintiffs are entitled to a preliminary injunction in order to protect their fundamental rights at issue here.

241.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT II
### THE REGULATION AND THE PROGRAM GUIDE VIOLATE THE FIFTH AMENDMENT

242.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

243.    The Regulation and the Program Guide violate, and are contrary to, the Fifth Amendment to the United States Constitution, both on their face and as applied

by the SBA to Plaintiffs, for numerous and various reasons including but not limited to the fact that:

a.    They treat establishments presenting certain forms of live performance dance entertainment, such as Plaintiffs, differently from establishments presenting other forms of entertainment or no entertainment at all, for no compelling, important, or rational reason;

b.    They treat workers at establishments presenting certain forms of live performance dance entertainment, such as Plaintiffs, unequally and differently from workers at establishments presenting other forms of entertainment or no entertainment at all, for no compelling, important, or rational reason;

c.    They violate the occupational liberty rights of the Plaintiffs, their employees, and the entertainers who perform on their premises;

d.    They violate the substantive and procedural Due Process rights of the Plaintiffs, their employees, and the entertainers who perform on their premises;

e.    They treat, have been used to treat, and could continue to treat in the future, similarly situated persons and businesses differently without justification;

f.    They treat First Amendment-protected businesses differently by, for example, providing RRF grants to businesses other forms of protected entertainment such as stand-up comedy, while denying Plaintiffs access to the RRF benefits;

g.    They are being arbitrarily applied by the Defendants; and

h.    They are impermissibly vague on their face and as applied to these Plaintiffs.

56

244.    As a direct and proximate result of the unconstitutional aspects of the Regulation and the Program Guide as well as the Defendants', and their delegates', application of them against Plaintiffs and Plaintiffs' interests, all as referenced above, Plaintiffs, as well as their owners and employees, the entertainers who perform on Plaintiffs' premises and the customers who frequent their establishments, have suffered and will continue to suffer irreparable injuries, including but not limited to financial ruin, business ruination, and, violation of their Fifth Amendment Rights, and the inability to present, view, and/or engage in First Amendment-protected speech, expression, and entertainment.

245.    Because of the Fifth Amendment rights being infringed upon by Defendants' application of the Regulation and the Program Guide as referenced above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

246.    Plaintiffs do not have adequate remedies at law because, among other reasons, the violation of their Fifth Amendment rights cannot be undone and they cannot recover damages against the Defendants as a result of governmental immunity. In addition, Plaintiffs have a substantial likelihood of success on the merits in regard to their claims asserted herein. Consequently, and because of the irreparable harm that is being suffered by these Plaintiffs, and which will continue to be suffered by these Plaintiffs if this Court does not grant preliminary relief, Plaintiffs are entitled to a preliminary injunction in order to protect their fundamental rights at issue here.

247.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT III

**THE SBA'S USE OF THE TERM "PRURIENT" VIOLATES THE APA AND IS OTHERWISE INVALID**

248.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

249.    The SBA or its Administrator's defining of "prurient" as "lustful," "lascivious," and/or "erotic" is not a legitimate or lawful exercise of the SBA's or its Administrator's authority, and is otherwise invalid under the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* and applicable law because, among other reasons:

      a.    As applied, the SBA's construction of the term "prurient" is inconsistent with its enabling act and the legal definition of "prurient" as articulated by the United States Supreme Court;

      b.    As applied, the SBA's construction of the term "prurient" is not a reasonable interpretation of the term;

      c.    As applied, the SBA's construction of the term "prurient" is arbitrary, capricious, an abuse of discretion in light of, and is directly contrary to, the SBA's enabling act, and in particular 15 U.S.C. § 633(e);

      d.    As applied, the SBA's construction of the term "prurient" would render 15 U.S.C. § 633(e) of the SBA's enabling act meaningless and of no effect;

      e.    As applied, the SBA's construction of the term "prurient" is not supported by the Regulation's findings because in promulgating the Regulation the SBA specifically acknowledged the Miller v. California, 413 U.S. 15 (1983) test of obscenity, with which the Regulation does not comply;

      f.    As applied, the SBA's construction of the term "prurient" is not supported by current constitutional standards of obscenity which, as

articulated by the United States Supreme Court, defines and operationalizes "prurient" as a "shameful or morbid" and "unhealthy" interest in sex, as opposed to "normal, healthy sexual desires";

g.    As applied, the SBA's construction of the term "prurient" is not supported by current constitutional standards of obscenity which, as articulated by the United States Supreme Court, rejects "lustful" as satisfying the constitutional standard for prurient appeal; and

h.    The SBA's construction of the term "prurient" is inconsistent with Congress's goals under ARPA.

250.    Because the Regulation is inconsistent with the SBA enabling act, as well as the broad form of relief provided by ARPA, as referenced above, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

251.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of governmental immunity. In addition, Plaintiffs have a substantial likelihood of success on the merits in regard to their claims asserted herein. Consequently, and because of the irreparable harm that is being suffered by these Plaintiffs, and which will continue to be suffered by these Plaintiffs if this Court does not grant preliminary relief, Plaintiffs are entitled to a preliminary injunction in order to protect their fundamental rights at issue here and enjoin the improper and unlawful actions of the Defendants here.

252.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## COUNT IV

## THE REGULATION VIOLATES THE APA AND IS OTHERWISE INVALID

253.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

254.    The Regulation is not a legitimate or lawful exercise of the SBA's or its Administrator's rulemaking authority as applied to the RRF, and is otherwise invalid under the Administrative Procedure, 5 U.S.C. § 551 *et seq.* and applicable law because, among other reasons:

a.    It fails to serve any lawful or legitimate regulatory purpose for the SBA or its Administrator as to the RRF or otherwise;

b.    The SBA and/or its Administrator failed to make a sufficient record or to otherwise articulate a satisfactory explanation as to why the Regulation is a rational or reasonable response to a problem that the agency was charged with solving under ARPA particularly as it applies to the RRF;

c.    The SBA and/or its Administrator failed to make a sufficient record or otherwise examine relevant data to establish that the Regulation is a rational or reasonable response to a problem that the agency was charged with solving under ARPA;

d.    Congress did not delegate authority to the SBA to promulgate substantive rules to implement the RRF, thus, the SBA is without authority to incorporate the Regulation as eligibility criteria into the RRF;

e.    The SBA's attempted incorporation of the Regulation into the RRF is procedurally invalid because the SBA did not engage in rulemaking or publish a rule in the Federal Register to, if it had the authority, incorporate the Regulation into the RRF; and

f.    The Regulation applies to SBA business loans and the RRF is a grant.

60

255.    Because the Regulation is inconsistent with the SBA enabling act, as well as the broad form of relief provided the RRF in ARPA, as referenced above, and because it does not represent a rational and reasonable response to a problem that the agency was charged with solving, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

256.    Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of governmental immunity. In addition, Plaintiffs have a substantial likelihood of success on the merits in regard to their claims asserted herein. Consequently, and because of the irreparable harm that is being suffered by these Plaintiffs, and which will continue to be suffered by these Plaintiffs if this Court does not grant preliminary relief, Plaintiffs are entitled to a preliminary injunction in order to protect their fundamental rights at issue here.

257.    For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

### COUNT V

**THE PROGRAM GUIDE AND THE TRAINING SLIDE VIOLATE THE APA AND ARE OTHERWISE INVALID**

258.    Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

259.    The Program Guide and the Training Slide are not legitimate or lawful exercises of the SBA's or its Administrator's rulemaking authority as applied to the RRF, and are otherwise invalid under the Administrative Procedure, 5 U.S.C. § 551 *et seq.* and applicable law because, among other reasons:

    a.    The Training Slide adds requirements that are not found in ARPA;

61

b.      Congress did not delegate to the SBA authority to promulgate legislative rules that have the force and effect of law under the RRF with regard to the Training Slides, ARPA's definition of "affiliated business," and ARPA's definition of "eligible entity";

c.      The Program Guide's definition of "affiliated business" contradicts the statutory definition "affiliated business" found at 15 U.S.C. § 9009c.(a)(2);

d.      The Program Guide's addition of the Regulation as RRF eligibility criteria contradicts the statutory definition of "eligible entity" found at 15 U.S.C. § 9009c.(a)(4);

e.      The SBA lacks the authority to promulgate substantive rules and regulations related to ARPA's definition of "affiliated business";

f.      The SBA lacks the authority to promulgate substantive rules (also known as legislative rules) and regulations related to eligibility for the RRF;

g.      Congress did not delegate authority to the SBA to engage in rulemaking or to otherwise promulgate substantive rules or regulations to implement    or    alter    the    definitions    of    "eligible    entity or "affiliated business" as found in 15 U.S.C. § 9009c.;

h.      The SBA's compliance powers do not serve as a basis for substantive rulemaking;

i.      As a substantive or legislative rule, the Program Guide's promulgation is procedurally defective for various reasons including, but not limited to, it was not promulgated pursuant to notice-and-comment rulemaking, it did not contain a finding of good cause for foregoing notice-and-comment rulemaking, it was not published in the Federal Register, and public comment was not authorized;

62

j.     If classified as a general policy statement or interpretive rule, the SBA is using the Program Guide as if it had the force of law, which it does not have due to the procedural defects listed above and the fact that it imposes new rights or duties and shapes the conduct of regulated entities, by, among other things, designing the RRF application portal to incorporate the Program Guide and to preclude an otherwise eligible RRF applicant, but for the Program Guide's additions to the statutorily defined terms "affiliated business" and "eligible entity," from completing an RRF application;

k.     It fails to serve any lawful or legitimate regulatory purpose for the SBA or its Administrator as to the RRF or otherwise;

l.     The SBA failed to make a sufficient record or to otherwise articulate a satisfactory explanation as to why the Program Guide, if it were authorized to do so, as a rational or reasonable response to a problem that the agency was charged with solving under ARPA and in particular the RRF; and

m.     The SBA failed to make a sufficient record or otherwise examine relevant data to establish that the Program Guide is a rational or reasonable response to a problem that the agency was charged with solving.

260.   Because the Program Guide and Training Slide is inconsistent with ARPA, the APA, and in excess of the SBA's authority, as well as contrary to the broad form of relief provided the RRF in ARPA, as referenced above, and because they do not represent a rational and reasonable response to a problem that the agency was charged with solving, this Court has the authority to declare the rights and the legality of actions of the various parties and should do so here.

261.   Plaintiffs do not have adequate remedies at law because, among other reasons, they cannot recover damages against the Defendants as a result of governmental immunity. In addition, Plaintiffs have a substantial likelihood of success on the merits in regard to their claims asserted herein. Consequently, and

because of the irreparable harm that is being suffered by these Plaintiffs, and which will continue to be suffered by these Plaintiffs if this Court does not grant preliminary relief, Plaintiffs are entitled to a preliminary injunction in order to protect their fundamental rights at issue here.

262. For the reasons set forth above, Plaintiffs are entitled to judicial review with regard to the actions and inactions of the Defendants pursuant to 5 U.S.C. § 702.

## **PRAYER FOR RELIEF**

A. Issue orders granting a national Temporary Restraining Order, Preliminary, and Permanent Injunction enjoining the Defendants, as well as their employees, agents, and representatives, from enforcing or utilizing in any fashion or manner whatsoever, the SBA's Restaurant Revitalization Funding Program, Program Guide as of April 28th, 2021, and 13 C.F.R. § 120.110(p), in regard to Restaurant Revitalization Fund Grant Program applications made pursuant to the Section 5003 of the American Rescue Plan Act of 2021, Pub. L. 117-2 (2021). As part of these orders, Plaintiffs further request this Honorable Court to:

1) Order Defendants, as well as their employees, agents, and representatives, to, as expeditiously as possible, revise the Restaurant Revitalization Funding Program application portal to eliminate the three affiliation questions added by the SBA's Restaurant Revitalization Funding Program, Program Guide as of April 28th, 2021, as described in paragraph 54 of this Complaint;

2) Order the Defendants, as well as their employees, agents, and representatives, to grant Plaintiffs' Restaurant Revitalization Funding Grant Program applications made pursuant to Section 5003 of the American Rescue Plan Act of 2021, Pub. L. 117-2 (2021) if they otherwise qualify for such grants if not for the provisions of 13 C.F.R. § 120.110(p)

64

and the SBA's Restaurant Revitalization Funding Program, Program Guide as of April 28th, 2021;

3) Order the Defendants, as well as their employees, agents, and representatives, to, as expeditiously as possible, restore Plaintiffs to their place in the application queue as they were at the time of application in the event that their application has been already formally denied, derailed, or paused because of the provisions of either 13 C.F.R. § 120.110(p) or the SBA's Restaurant Revitalization Funding Program, Program Guide as of April 28th, 2021, or both; or to place them in the application queue where they would have been if they had been able to complete the application but for the questions and prompts described in paragraph 54;

B.     Enter an award of attorneys' fees and costs against the Defendants and in favor of the Plaintiffs pursuant to 28 U.S.C. § 2412 and otherwise; and

C.     Enter such other and further relief as this Court may find to be just and proper in these circumstances.

Respectfully submitted,

Dated: May 14, 2021

*/s/ Arthur Fritzinger*
Arthur P. Fritzinger (PA 309533)
1650 Market Street, Ste. 2800
Philadelphia, PA 19103
Afritzinger@cozen.com
T: 215-665-7264
*Attorney for All Plaintiffs*

*s/ Bradley J. Shafer*
Bradley J. Shafer (MI P36604)*
Brad@BradShaferLaw.com
Matthew J. Hoffer (P70495)*
Matt@BradShaferLaw.com
Zachary M. Youngsma (MI P84148)*
Zack@BradShaferLaw.com
**SHAFER & ASSOCIATES, P.C.**
3800 Capital City Boulevard, Suite 2
Lansing, Michigan 48906
T: 517-886-6560
F: 517-886-6565
*Attorneys for All Plaintiffs*
***Pro Hac Vice Application Pending**

65

## VERIFICATION OF COMPLAINT AS TO:
### Kimmico, Inc.

1.      I, Calvin Brockdorff, am the President of Kimmico, Inc.

2.      I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.      I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.      The factual statements in the Complaint, as they pertain to Kimmico, Inc., are true and accurate to the best of my information, knowledge and belief.

5.      Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: _5-11-21_

By: _____ Calvin Brockdorff

## VERIFICATION OF COMPLAINT AS TO:
## BT California, LLC; Gold Club-SF, LLC; and S.A.W. Entertainment, Ltd.

1.      I, Joseph Carouba, am the President, Manager, or authorized, as appropriate, of BT California, LLC; Gold Club-SF, LLC; and S.A.W. Entertainment, Ltd.

2.      I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.      I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.      The factual statements in the Complaint, as they pertain to BT California, LLC; Gold Club-SF, LLC; and S.A.W. Entertainment, Ltd., are true and accurate to the best of my information, knowledge and belief.

5.      Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: _MAY 11, 2021_        _____
                              By:     Joseph Carouba

## VERIFICATION OF COMPLAINT AS TO:
### MAG Enterprises, Inc.; MAG PITT, LP; MAG Entertainment, LLC; and Oasis On Essington LLC

1.     I, John Meehan, am the President, Manager, or authorized Partner, as appropriate, of MAG Enterprises, Inc.; MAG PITT, LP; MAG Entertainment, LLC; and Oasis On Essington LLC.

2.     I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.     I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.     The factual statements in the Complaint, as they pertain to MAG Enterprises, Inc.; MAG PITT, LP; MAG Entertainment, LLC; and Oasis On Essington LLC, are true and accurate to the best of my information, knowledge and belief.

5.     Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: 5|13|2021

By: John Meehan

## VERIFICATION OF COMPLAINT AS TO:
## KWLT, LLC and KWON, LLC

1.     I, Gregory Kenwood Gains, am the Managing Member of KWLT, LLC and KWON, LLC.

2.     I make this verification upon my personal knowledge, unless specifically stated to the contrary.

3.     I have reviewed the foregoing *PLAINTIFFS' VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF* (the "Complaint") in its entirety.

4.     The factual statements in the Complaint, as they pertain to KWLT, LLC and KWON, LLC, are true and accurate to the best of my information, knowledge and belief.

5.     Except, any matters stated to be upon "information and belief," I verily believe to be true.

**I VERIFY UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on: **5|11|2021**

By:     Gregory Kenwood Gains